Peck, J.,
delivered the opinion of the Court.
■ These petitioners, Amos and John E. Kendall, represent that, being *262 referred by the Senate to this court, they submit the following as the origin and substance of their claim :
That in 1843 they were applied to by the Western Cherokees, being that portion of the Cherokee tribe of Indians which emigrated to the country west of the Mississippi river prior to the year 1835, to aid them as agents and counsel in prosecuting an important claim against the United States. That the Indians had no other means of compensating counsel than by giving a lien on a portion of the claim itself; and becoming satisfied that the claim was a good one, these parties consented to aid in its prosecution for a commission of five per cent, upon any moneys or whatever else of value might be recovered, which percentage was secured by a power of attorney, coupled with a contract for service to be rendered, authorizing the claimants to receive their compensation directly from the United States. Under this arrangement, which the claimants supposed was in conformity to the practice of the government and in conformity with law, they entered* zealously upon the performance of their duties. They examined voluminous documents, and prepared elaborate memorials and arguments, requiring for their preparation great research, diligence, and labor. That after years of persevering effort the government was convinced that injustice had been done the Indians, and the efforts of the petitioners were crowned with success, and the Cherokee Indians became united as a tribe, and were remunerated by Congress.
That these efforts of the claimants were continued from 1843 to 1851, during all which time they were recognized by the government as the authorized agents and counsel of the Western Cherokees, including three different Secretaries of War, one Secretary of the Interior, four several Commissioners of Indian Affairs, and the commissioners who negotiated the Cherokee treaty.
That when the treaty left the hands of the commissioners it contained a provision setting apart fifty thousand dollars with which to pay the debts and counsel fees of the Western Cherokees. The Senate, however, in ratifying the treaty, struck out this provision, leaving the Indians without a fund from which their obligations could be met, as the amount to be paid by the treaty was to be distributed per capita among the individual Western Cherokees, who were represented in all these transactions by a committee or headmen of their tribe.
The Indians recognized their obligation, and being desirous to keep faith with their counsel, they paid them five per cent, out of a sum of twenty thousand dollars advanced by the government, and further *263 directed, by indorsement on the contract already existing, that the Secretary of War should “pay the commissions stipulated for in the within contract out of any moneys which may be appropriated to pay the debts of the old settlers, or out of any moneys which may be found due to them under said treaty, it being our intention that this contract shall be executed in good faith.”
Applications were made to Congress by these claimants for an appropriation to meet the commissions due to them, upon which favorable reports were made, hut no favorable result was reached.
The claimants insist that Congress and all other proper departments were notified of the existence of their claim, yet without regard to its merits, such action was taken as defeated its recovery, and, as is insisted by them, the aggregation of the different tribes or parts of the Cherokee nation into one, prevented all hope of redress, as by that means that portion of these people who contracted with these claimants was so merged in the larger body that there was no recourse left.
It is also stated that other attempts were made to secure payment of this claim by inducing the Indians, individually, to meet it out of their per capita allowances, but this also proved ineffectual.
The claimants pray that the sum of forty-four thousand three hundred and seventy-four dollars, being five per centum of the amount paid to the Indians, may be adjudged to them.
It is also averred that certain lands were granted the Indians which, as matters of value recovered by the instrumentality of these claimants, should, under the contract, be apportioned to them.
This is the substance of the petition filed by these claimants, which recites much of the history of the proceedings not necessary to an understanding of the case.
If we could award these claimants a judgment for meritorious services rendered, for great labor and diligence bestowed, or for patient research where learning and skill were brought into requisition, this record would furnish ample authority for doing so, but the' restraints of duty intervene to prevent.
It may have been and probably was the practice of the government for many years, in its transactions with the Indian tribes, to reeognize obligations similar to that presented in this case, executed between them and their agents or creditors; but this practice was always subject to any change that the public welfare or that of the Indians might require, and was not so irrevocable that a liability would be created in defiance of whatever change it might become expedient to adopt in that regard.
*264 In this case there was no privity of contract between the claimants and the government; the motive of the contract was to act upon the government, and to induce action by it. The services required were supposed to be in antagonism to its views, or at least were designed to set it in motion upon a different plan from that theretofore pursued; if not that, at least to persuade it to recognize a right in these particular Indians to something which previously had been denied or withheld. It was the effort of these Indians to make a new or a different bargain with the government, which, as they supposed, would inure to their benefit. Whatever benefit might result to the government was auxiliary to the objects which the clients of these claimants had in view when this bargain was made between them.
The compensation of the claimants, as depending upon the policy of the government, was at their risk. What that policy had been they knew; what it might be was matter of doubt and uncertainty, and it must be presumed that they were not ignorant of the probability of change.
Public policy changes with events, is not governed by fixed laws, and no certain rule of action or right of recovery can be made to depend upon it. The great affairs of a nation or its policy can neyer be held subordinate to individual rights or interests, and the latter must yield to the former, and are often made to do so with great appearance of hardship.
The United States never assumed in any way to interfere with a proper exercise of legislative discretion, or with the treaty-making power, and cannot be held to answer pecuniarily for the result of either; and, above all, never intended to make these important prerogatives subservient to the rights of any individual who might happen to be the possessor of a power of attorney, coupled with an interest.
The treaty upon which this claim is attempted to be based was signed on the sixth of August, 1846, and was ratified by the Senate two days afterwards, that part of the fifth article which deducted $50,000 from the gross sum to defray, among other things, the expenses of the Indians in prosecuting their claims against the government, having been stricken out. On the thirteenth of that month the representatives of the “Western Cherokees” declared that they gave their “ free and voluntary assent to the amendment,” and with the other representatives of the Cherokee nation approved the treaty as amended. If the Indians did not desire this amendment, they do not appear to *265 have objected to it. The appropriation by Congress in furtherance of the treaty was not made until the 30th September, 1850, more than four years after it was ratified and a second time approved. During all this period it does not appear that the Indians desired any change of the treaty, nor does Congress appear to have been in haste to defeat the claimants, if any such motive could be imputed to that body. The appropriation was in strict conformity with the treaty, which directed that the money should “ be held in trust by the government of the United States and paid out to each individual belonging” to the “ Western Gkerolcees, or old settlers.” Congress could not, in disregard of this trust, direct the money to be paid to others claiming it in their own right. The same article of the treaty further declared that the fund should not be assignable, but should be paid in strict conformity with the trust imposed.
Mr. R. H. Gillet and Mr. J. D. McPherson for the claimants.
Mr. John J. Weed, Assistant Solicitor, for the government.
The treaty was paramount law, and Congress so recognized and obeyed it. The government had no other than the trust fund out of which an assignment to these claimants, or to any one else, could be paid. The right of the claimants to receive under their power was not disputed, if they could have brought themselves within the conditions of the trust; but outside of that, the government had not means or authority, unless it diverted the trust fund, which was not allowable.
We do not know the reasons which induced the modification of the treaty, nor which party suggested it, but we must suppose that wisdom dictated the change; but whatever the reason, individuals cannot imply a contract or right of action against the government upon the fact that, in the administration of its affairs, unexpected or unprecedented efforts are made to secure the repose and prosperity of its people by a resort to new theories or a new policy, although by that means prospects of gain may be disappointed.
The petition will be dismissed.
Wilmot, J., dissented.